**Affidavit in Support of Application for Seizure Warrant**

I.   Introduction

1. Your Affiant is Officer Charles E. Fultz of the Metropolitan Police Department for the District of Columbia. Being duly sworn, I hereby state the following in support of this Application for Seizure Warrant.

2. Your Affiant has been a sworn member of the Metropolitan Police Department (MPD) since 1994-1998, 2002 to the present and is currently assigned to the Major Narcotics Branch. During my tenure with the department I have been involved in more than 1000 narcotics and weapons related arrests and specialized in investigating violations of narcotic laws in the District of Columbia and the United States. I have attended training sponsored by MPD's Financial Investigations Unit concerning money laundering and the forfeiture of assets. I have also been federally deputized as a Task Force Officer with the Federal Bureau of Investigation and have attended training seminars concerning multijurisdictional investigations. As a part of this training, I have received blocks of instruction on conducting financial investigations, asset forfeiture, and money laundering as they relate to narcotics trafficking offenses and drug traffickers.

3. This affidavit is submitted in support of an application for a seizure warrant for:

   **all funds relating to the withdrawal from the Bank of America account #xxxxxxx 4910, in the name of Alfred D. Chambers, used to purchase Bank of America Cashiers Check #0148037, made payable to Alfred Chambers and Ramona Chambers in the amount of $18,500.00, generated at the Minnesota Avenue, N.E., Washington, D.C. branch of the Bank of America.**

4. The information contained herein is based on personal knowledge, information provided to your Affiant by sworn officers, and information obtained from public records, cooperative witnesses, and other sources as indicated herein.

5. Based on your Affiant's training and experience, your Affiant knows:

   a. That narcotics traffickers often purchase and/or title their assets in the names of relatives, associates aliases, or in the name of other individuals known as nominees to avoid the detection of these assets by government agencies.

   b. That narcotics traffickers will pay individuals or associates to act as nominees to obtain property to assist them in hiding their assets from government agencies.

    c. That although those assets are in others' name, that narcotics traffickers do actually own and utilize their assets, and that they exercise dominion and control over them.

    d. It is common for narcotics traffickers to conceal narcotics, other contraband, proceeds of drug sales and records of drug transactions in secure locations within their residences, their businesses and/or other locations over which they maintain dominion and control, for ready access and to conceal these items from law enforcement authorities.

    e. In order to accomplish this concealment, narcotics traffickers frequently have "stash" places in which the traffickers maintain evidence pertaining to their narcotics business as well as records which reflect the manner in which they conceal narcotics proceeds, such as:

1. Currency
2. Financial Instruments
3. Precious metals and Gemstones
4. Jewelry
5. Books
6. Records
7. Invoice receipts
8. Bank records
9. Photos
10. Safe deposit box keys

within their residences, businesses, or other locations over which they have access to and maintain dominion and control over.

    f. Narcotics traffickers must have on hand large amounts of currency in order to maintain and finance their ongoing narcotics business.

    g. That when narcotics traffickers amass large proceeds from the sale of drugs they attempt to legitimize these profits through money laundering activities. To accomplish their goals, narcotics traffickers utilize, such entities as, domestic and international banks and their attendant services, securities brokers, professionals such as attorneys and accountants, casinos, real estate, shell corporations and business fronts, and otherwise legitimate businesses which generate large quantities of currency.

h.  That the sale of cocaine and other controlled dangerous substances generate large quantities of United States Currency in small denominations.

i.  That the Currency Transaction Report (CTR) IRS form 4789, which is required to be completed and filed with the IRS by all financial institutions on every currency transaction that exceeds $10,000.00, causes tremendous problems for narcotics traffickers when they attempt to negotiate their illegal profits at a financial institution.

j.  That, in order to evade the filing of a CTR, narcotics traffickers often "structure" their currency transactions so that no one transaction exceeds $10,000.00 or they provide false or misleading information in an attempt to legitimize or conceal the source and/or ownership of the currency.

k.  That narcotics traffickers at times become fearful that their extravagant spending habits will bring them under scrutiny by the IRS or other federal, state, and local agencies. In order to legitimize their spending, these traffickers file tax returns reporting income commensurate with the amount of money they have spent during the year, which they feel, can be traced and documented by the government. The "source" of their income reported on these returns is usually falsely stated, misleading, or generic in terms.

l.  That the courts have recognized that unexplained wealth is probative evidence and crimes motivated by greed, in particular trafficking in controlled substances.

m.  That narcotics traffickers commonly have in their possession, on their person, at their residences and/or their businesses, firearms which are used to protect and secure a narcotics traffickers property which may include, narcotics, jewelry, narcotics paraphernalia, books, records, and U.S. Currency.

II. **Nature of Investigation**

5. On April 28, 2005, members of the Metropolitan Police Department's Major Narcotics Branch (MNB) were conducting "buy bust" operations in the area of the xxxxxxxxxxxxxxxxxxxxxxxxxx, Washington, D.C. in response to numerous complaints of illicit narcotics sales. The members sent an undercover police officer, hereinafter referred to as UC, into the aforementioned block operating

an unmarked MPD vehicle. The UC observed a subject, who was later identified as Alfred Chambers, reach into the front area of his trousers and retrieve a plastic bag, which subsequently contained numerous smaller green ziplock bags. Moments later the UC observed an unidentified male approach Chambers and Chambers exchanged a small ziplock bag for U.S. Currency from the male. The unidentified male then exited the area. A short time later, while still sitting in the MPD vehicle, the UC observed a grey-colored Chrysler Sebring operated by a female travel into the block and stop behind the UC's vehicle. Chambers approached the vehicle and once again exchanged small green ziplock bags for U.S. Currency. The UC exited the MPD vehicle and engaged Chambers in a conversation to purchase "two dimes", a term known in the narcotics trafficking industry for the purchase of two $10.00 bags of narcotics. Chambers stated that he did not sell "dime bags" and the UC returned to the MPD vehicle to broadcast a lookout for Chambers and the operator of the Chrysler. Members of the MNB arrest team moved into the area and stopped the defendant and the operator of the Chrysler.

6. The female operator of the Chrysler was found to be in possession of the following items.

   a. Two small green ziplock bags containing a white rock like substance.
   b. Two small clear ziplock bags containing a white powder substance.
   c. One xanax pill.

   A portion of the white rock like substance was field tested and gave a positive reaction for cocaine.

7. Chambers was found to be in possession of the following items.

   1. Nine small ziplock bags containing a white rocklike substance.
   2. U.S. Currency in the amount of $1,200.00.

   A portion of the white rocklike substance was field tested and gave a positive reaction for cocaine. The approximate weight of the recovered narcotics was 6.8 grams.

8. The MNB members identified a black Ford Explorer parked nearby as one registered to Chambers. Chambers gave the MNB members verbal permission to search the vehicle. The below listed item was recovered from the vehicle.

   1. Eleven large ziplock bags containing a white rocklike substance.

A portion of the white rocklike substance was field tested and gave a positive reaction for cocaine. The approximate weight of the seized narcotics was 42.5 grams.

9. On May 2, 2005, the Honorable Judge Bruce Mencher, of the Superior Court of the District of Columbia, issued a warrant to search Chambers's residence, located at xxxxxxxxxxxxxxxxxxxxxx, apartment number xx, Washington, D.C. (A copy of that search warrant is attached hereto.) That warrant was executed on May 3, 2005. Upon entry into the premises officers were met by a female, later identified as Romona Chambers. Ramona Chambers, who identified herself as Alfred Chambers's spouse. The below listed items were recovered during the execution of the search warrant.

    1. Approximately 169.34 grams of a white rock like substance. A portion of which field tested positive for cocaine.
    2. $3,563.00 in U.S. currency.
    3. .380 caliber semi-automatic handgun.
    4. Live ammunition.
    5. A digital scale bearing a white residue.
    6. A plate bearing a white residue.
    7. Numerous empty ziplock bags.
    8. Purported loan agreements from the defendant to businesses and individuals.

10. During the execution of the aforementioned search warrant Ramona Chambers stated to MPD Detective William Witkowski and MPD Officer Charles Fultz of the Major Narcotics Branch ("MNB") that she and Alfred Chambers had recently purchased a blue Buick. Ramona Chambers further stated to the MNB members that the vehicle was purchased for her and she gave consent to search the same. Detective Witkowski recovered from the vehicle the subject Bank of America cashier's check number 0148037 in the amount $18,500.00. The subject cashier's check, which was purchased from the Minnesota Avenue, N.E. branch of the Bank of America on May 2, 2005, is made payable to Alfred Chambers and Ramona Chambers.

11. According to Bank of America records, the money used to generate the subject cashier's check was withdrawn from account #xxxxxxxx4910, on May 2, 2005. Significantly, Chambers is the sole signatory on this account. Combined records of Chambers' checking and savings accounts at Bank of America (#s xxxxxxxx 4910 and xxxxxxxx 7315), from June 2003 through May 2005, reflect deposits totaling $57,992.10. Bank of America records further reflect the regular deposit of large amounts of cash in round figures which are consistent with the laundering of drug proceeds. For example, Bank of America records

reflect the following deposits on the following dates: $200 on 6/28/04; $300 on 8/9/04; $350 on 8/25/04; $300 on 9/7/04; $420 on 9/10/04; $300 on 9/20/04; $300 on 10/18/04; $600 on 11/1/04; $1,200 on 11/30/04; $1,600 on 12/3/04; $350 on 12/13/04; $300 on 12/24/04; $400 on 1/10/05; $275 and $1,200 on 3/10/05; $2,000 on 3/28/05; $2,500 on 4/19/05; and $1,500 on 5/2/05. Notably, these cash deposits significantly increase in late 2004 and 2005.

12. MPD MNB Officer Charles Fultz interviewed the resident manager of the apartment complex in which Alfred and Ramona Chambers resided. The manager stated that Alfred Chambers had requested to be moved to a larger apartment within the same complex, but the request was denied because the manager was unable to confirm the Alfred Chambers's employment status.

13. According to records from the District of Columbia Employment Services, Alfred Chambers has had limited legitimate income from 2002 through 2005. Specifically, those records reflect that Chambers received only a total of $2,090 for the second and third quarters of 2002 from employment with Guaranteed Products Corp.; only a total of $3,253 for the first quarter of 2003, from employment with D.C. Health Care Inc. and Guaranteed Products Corp.; a total of $18,148 for the second, third, and fourth quarters of 2004, from employment with Goodwill of Great Washington and Guaranteed Products Corp.; and a total of $6,168 for the first quarter of 2005 from employment with Goodwill of Greater Washington and Guaranteed Products Corp. Maryland and Virginia wage records did not reflect any income for Alfred Chambers.

14. According to wage records from Maryland, Ramona Chambers has had sporadic part-time employment since the year 2000, with minimal income from these sources. In 2000, Ramona Chambers worked for Verizon Maryland Inc., earning $3,912 in the second quarter and $3,461 in the third quarter. In 2003, Ramona Chambers worked for PMC Staffing Solutions Inc., earning $596 in the fourth quarter of 2003. Virginia wage records did not reflect any income for Ramona Chambers.

15. According to records from the District of Columbia Employment Services, Ramona Chambers has continued to have sporadic and limited income from 2003 through 2005. In 2003, while employed at Premier Yachts Inc., she earned $290 during the second quarter, $3,203 during the third quarter, and $1,837 during the fourth quarter. In 2004, while employed at Sasha Bruce Youthwork Inc., she earned $1,300 during the third quarter and $1,602 during the fourth quarter. In 2005, while employed at Sasha Bruce Youthwork Inc, she earned $2,175 during the first quarter. Also, in 2005, while employed at National Childrens' Center, she earned $245.

16. On May 26, 2005, based upon the events described above, a Federal Grand Jury returned an Indictment charging Alfred Chambers with three (3) narcotics offenses – Distribution of Cocaine Base, in violation of 18 U.S.C. §§ 841(a)(1) and 841(b)(1)(C); Possession with Intent to Distribute 5 Grams or More of Cocaine Base, in violation of 18 U.S.C. §§ 841(a)(1) and 841(b)(1)(B)(iii); and Possession with Intent to Distribute 50 Grams or More of Cocaine Base, in violation of 18 U.S.C. §§ 841(a)(1) and 841(b)(1)(A)(iii). Alfred Chambers was also charged with two firearms offenses – Possession of a Firearm and Ammunition by a Person Convicted of a crime Punishable by Imprisonment for a Term Exceeding One Year, in violation of 18 U.S.C. § 922(g)(1); and Carrying and Possessing a Firearm During a Drug Trafficking Offense, in violation of 18 U.S.C. § 924(c)(1). Additionally, the Indictment alleges the forfeiture of $1,200.00 in U.S. currency seized from Alfred Chambers, $3,563.00 in U.S. currency seized in connection with the May 2nd search of the Chambers' residence, and a .380-caliber semi-automatic handgun along with seven live rounds of .380 ammunition and other assorted rounds of ammunition also seized from the May 2nd search of the Chambers' residence.

## III. Conclusion

17. Based upon my training and experience, the numerous large deposits of cash on a regular basis and a total of $57,992.10 in deposits in less than two years into Bank of America accounts #xxxxxxxx 4910 and #xxxxxxxx 7315, held in the name of Alfred Chambers, despite Chambers's lack of legitimate sources of income, is evidence of significant unexplained wealth which would be consistent with Chambers's history of drug trafficking. Based upon the foregoing facts, there is probable cause to believe that the funds from Bank of America account #xxxxxxxx4910 which were transferred into the subject cashier's check are proceeds of illegal drug trafficking, in violation of Title 21, U.S.C., Section 841, which is, therefore, subject to forfeiture pursuant to Title 21, U.S.C., Section 881(a)(6). Specifically, Section 881(a)(6) provides for the forfeiture of "[a]ll monies . . . furnished or intended to be furnished by any person in exchange for a controlled substance, . . . all proceeds traceable to such an exchange, and all moneys, . . . used or intended to be used to facilitate [drug trafficking]."

18. Seizure of drug proceeds subject to forfeiture is authorized under Title 21, U.S.C., Section 881(b) provides that "[a]ny property subject to forfeiture to the United States may be seized by the Attorney General . . . ."

19. It is, therefore, requested that warrants be issued for the seizure of:

    **all funds relating to the withdrawal from the Bank of America account #xxxxxxxx 4910, in the name of Alfred D. Chambers,**

**used to purchase Bank of America Cashiers Check #0148037, made payable to Alfred Chambers and Ramona Chambers in the amount of $18,500.00, generated at the Minnesota Avenue, N.E., Washington, D.C. branch of the Bank of America.**

_____
Charles Fultz
Detective, Metropolitan Police Department
Deputy U.S. Marshal

**Subscribed and sworn before me this _____ day of July, 2005**

_____
United States Magistrate Judge
United States District Court
District of Columbia

# ATTACHMENT